[Sac. No. 7840.   In Bank.   June 18, 1969.]

THE PEOPLE, Petitioner, v. THE SUPERIOR COURT OF SHASTA COUNTY, Respondent; GARY WYNN CASEBEER et al., Real Parties in Interest.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Jack R. Winkler, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

266

Jere E. Hurley, Jr., for Real Parties in Interest.

SULLIVAN, J.—Defendants Gary Wynn Casebeer and Joy Marguerite Marsdin are charged by separate informations in the respondent court with transportation of marijuana (Health & Saf. Code, § 11531) and in an additional count with possession of marijuana (Health & Saf. Code, § 11530). Pursuant to Penal Code section 1538.5 each of said defendants moved to suppress certain evidence alleged to have been unlawfully seized and the respondent court granted their motions. The People then filed in the Court of Appeal, Third Appellate District their petition for a writ of prohibition and mandate restraining the enforcement and commanding the annulment of the lower court's order. (Pen. Code, § 1538.5, subd. (o).) The petition was denied as to defendant Marsdin but granted as to defendant Casebeer, and as to the latter an alternative writ of prohibition and mandate was issued. The People appear to have conceded in the Court of Appeal that there is substantial evidence to support the trial court's determination that a search of defendant Marsdin's purse was unlawful. The Court of Appeal rendered its decision ordering the issuance of a peremptory writ of mandate directing the trial court to vacate its order suppressing evidence insofar as it related to certain marijuana and marijuana smoking equipment seized during the search of the automobile which defendant Casebeer was driving and in which defendant Marsdin was riding. Thereafter on Casebeer's petition we granted a hearing in this court.

On November 22, 1967, defendants Casebeer and Mrs. Marsdin, together with two companions, Darrell Leonard and Peter Michaud, were travelling through Shasta County in a Pontiac automobile owned by Leonard. The four were members of a musical group en route from Alaska to Texas. They were towing a rental trailer which contained their musical instruments, luggage and other personal belongings. Casebeer was driving the car, Michaud was in the right front seat and Leonard and Mrs. Marsdin were in the back seat, the latter apparently asleep.

About 3:30 p.m. Officer Tyrell of the California Highway Patrol observed the automobile going up a hill in the middle lane of a three-lane highway. He noticed that the right-hand rear-view mirror on the automobile was tilted downwards. Because the car was towing a trailer in the wrong lane (Veh.

Code, § 21655, subd. (b))[1] and was equipped with a defective. rear-view mirror (Veh. Code, § 26709),[2] the officer signalled defendant Casebeer to pull over to the side of the road. Casebeer complied and stopped on the shoulder of the highway behind the patrol car.

Officer Tyrell walked back to the Pontiac and asked Casebeer for his driver's license. Casebeer answered that he did not have a driver's license or any identification because his wallet had been stolen a short time before. The officer directed Casebeer to get out of the automobile and to proceed to the front of the patrol car. According to Casebeer, Officer Tyrell thereupon frisked him; according to the officer, he only questioned Casebeer. Casebeer produced a wallet he had been using as a substitute for the stolen one, and some bits of paper, but nothing which adequately identified him.

After ordering Casebeer to remain at the patrol car, Officer Tyrell returned to the Pontiac to question its other occupants. He asked them for identification and was apparently satisfied with the identification produced by Leonard and Michaud. Mrs. Marsdin, who had been asleep and was awakened when the vehicle stopped, produced a Canadian passport. She explained that her visa had been stolen but that she had a letter in her suitcase which would show that she was lawfully in the United States. The officer noticed that her speech "was a little bit erratic" and thought that "she was under the influence of something," although he "couldn't smell any alcohol." He had her step out of the vehicle and proceed to the front of the patrol car. At the same time, he ordered

[1]Vehicle Code section 21655, subdivision (b) provides in part: "Any vehicle subject to the provisions of section 22406 shall be driven in the lane or lanes designated pursuant to subdivision (a) whenever signs have been erected giving notice of such designation. When specific lane or lanes have not been so designated, any such vehicle shall be driven in the right-hand lane for traffic or as close as practicable to the right edge or curb. . . ." Among the vehicles subject to the provisions of section 22406 is "A passenger vehicle . . . drawing any other vehicle." (§ 22406, subd. (b).)

[2]At the time of the incident in question, Vehicle Code section 26709 provided in subdivision (b): "Every motor vehicle, of a type subject to registration, while towing a trailer or semi-trailer and the towed vehicle or load thereon obscures the driver's view to the rear, shall be equipped with mirrors on both the left- and right-hand sides of the vehicle so located as to reflect to the driver a view of the highway through each mirror for a distance of at least 200 feet to the rear of such vehicle." The statute was amended by Stats. 1967, ch. 548, p. 1896, and became operative in its present form on January 1, 1968.

Casebeer to return to the Pontiac and sit in the driver's seat.[3] The officer asked Mrs. Marsdin if she was under the care of a doctor; she replied that she was, and that an hour and a half previously, she had taken medication for a kidney infection.

At this point Mrs. Marsdin searched through her purse for further identification. As she did so the officer saw a gold cigarette case which he thought looked like a wallet. He asked her whether it was a wallet and according to the officer she replied, "No, this is my tobacco case." He asked her "if she cared if I looked at it" and she replied in the negative and handed the case to him. According to Mrs. Marsdin, the officer took the cigarette case out of her purse, handed it to her and ordered her to open it, then took it from her and looked inside. In it, he found marijuana. He then placed her under arrest.

After arresting Mrs. Marsdin, Officer Tyrell directed her to sit in the back seat of the patrol car. He radioed for assistance and then questioned her.[4] Mrs. Marsdin stated that she had no knowledge of the marijuana in the cigarette case. She did not suggest that there was marijuana in the automobile. She may have stated that someone was "out to get" her.

About 30 minutes later, three more highway patrol vehicles arrived at the scene. Officer Tyrell went back to the Pontiac and advised its three occupants that Mrs. Marsdin had been arrested and that he "was going to check them." One officer examined the license on the vehicle and radioed for information about it. Officer Tyrell and another officer ordered the men to get out of the car so they could be frisked. As he prepared to frisk Leonard, whom he had previously learned to be the owner of the car, Officer Tyrell asked him "if he cared if I checked the vehicle and he stated no. . . ."

The officer then proceeded to check the Pontiac. Under the left-front-bucket seat, he found a package of cigarette papers and a small pasteboard matchbox containing "a green-leafy substance" appearing to him to be, and later identified as, marijuana. Under the left portion of the dashboard and to the left of the steering wheel, he found a blue canvas bag containing numerous shoe shine articles. Among its contents were

---

[3]According to both defendants, Casebeer remained at the patrol car while the officer questioned Mrs. Marsdin.

[4]According to Officer Tyrell, he read Mrs. Marsdin a card explaining her rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] before asking any questions. According to Mrs. Marsdin, Tyrell did not read her the warnings until after he had asked some questions.

three plastic bags, each with a large amount of green-leafy substance, debris and seeds, a pipe and cigarette papers. The stem of the pipe was detached from the bowl; in the bowl itself were partially burned marijuana seeds. Finally, the officer found additional cigarette papers in the glove compartment. He then returned to the three male defendants standing near the patrol car, "read them their rights" and placed them under arrest for possession of marijuana.

As already stated, defendants Casebeer and Mrs. Marsdin were charged by information with transportation and possession of marijuana. After a hearing on defendants' motion to suppress evidence, made pursuant to Penal Code section 1538.5, respondent court held that the prosecution had not sustained its burden of proving that Mrs. Marsdin voluntarily consented to the search of her cigarette case,[5] that consent by the owner Leonard to the search of his car could not extend to the luggage of Casebeer, and that since Mrs. Marsdin had not voluntarily consented to the search of her cigarette case, "the search of the vehicle cannot be approved nor would the evidence found in such a search be admissible."

■■■ The positions of the parties may be summarized as follows: The People concede that there is substantial evidence to support the trial court's finding that Mrs. Marsdin did not consent to the search of her cigarette case but contend that all of the evidence arising out of the search of the automobile was lawfully obtained. They argue that Leonard's consent to search his car authorized the opening of the matchbox under the front seat, that the discovery of marijuana therein constituted probable cause for the arrest of the occupants of the vehicle, and that the remainder of the search was properly incidental to such arrest. Defendants on the other hand contend that Leonard's consent to the search of his car was coerced and invalid as a matter of law, and that, even if the consent had been freely given, the seizure of the contraband in the car resulted from the admittedly unlawful search and arrest of Mrs. Marsdin and the evidence thus secured should be excluded as "the fruit of the poisonous tree." (See *Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83

---

[5]The trial judge stated: "The evidence presented herein on the issues of whether the defendant actually gave consent to the search and if she did, that it was voluntary, does not preponderate on either side of the issue. Under the law, the Court is required to find against the party having the burden on the issue."

S.Ct. 407].)[6] In reply the People argue that Leonard's consent to the search of the car was an intervening independent act which severed or at least sufficiently attenuated the connection between the illegal search of Mrs. Marsdin and the search of the automobile to purge the primary taint of the unlawful action. (*Wong Sun* v. *United States, supra,* 371 U.S. 471, 487, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].) The crucial question emerging from this interchange is whether the contraband seized in the car was properly suppressed as evidence. (Pen. Code, § 1538.5.)

Taking up first the claim that Leonard's consent to the search of his car was involuntary as a matter of law, we observe that the circumstances under which it was given appear from the uncontradicted evidence to be highly coercive. The Pontiac which he owned and in which he had been riding, had been stopped by a highway patrol officer who ordered first Casebeer and then Mrs. Marsdin to get out of the vehicle and go with him to the patrol car. Casebeer was then sent back to the Pontiac and ordered to remain in the driver's seat. Mrs. Marsdin was detained in the patrol car. For approximately 30 minutes nothing further happened. Leonard and his companions were given no explanation for the delay. Upon the arrival of three more officers, Officer Tyrell finally informed Leonard that Mrs. Marsdin had been arrested and that the other three occupants of the Pontiac were going to be "checked out." Officer Tyrell then ordered Leonard to get out of the automobile so that he could be searched and asked whether Leonard cared if the officers checked the car. At no time was Leonard informed by any of the officers that he could effectively refuse consent.[7] The trial court did not make a finding as to whether or not Leonard's consent was volun-

---

[6]We reject defendants' argument that Leonard's consent to the search of his car did not extend to the matchbox. It can be reasonably inferred that a matchbox under the seat of the car was under the owner's control. (See *People* v. *Davis* (1957) 48 Cal.2d 241, 248-249 [309 P.2d 1] and cases there cited; *People* v. *Dixon* (1956) 46 Cal.2d 456, 459 [296 P.2d 557].)

[7]We do not intimate that Officer Tyrell had a duty to explain to Leonard that the latter had a constitutional right to refuse permission to check the car (see *People* v. *Roberts* (1966) 246 Cal.App.2d 715, 729 [55 Cal.Rptr. 62]; *People* v. *Burch* (1961) 196 Cal.App.2d 754, 767 [17 Cal. Rptr. 102]; cf. *United States* v. *Nikrasch* (7th Cir. 1966) 367 F.2d 740; *United States* v. *Moderacki* (D.Del. 1968) 280 F.Supp. 633, 635-636; *United States* v. *Blalock* (E.D. Pa. 1966) 255 F.Supp. 268, 269-270.) However as the court said in *Roberts*, "Failure to give such advice may, under the circumstances of a given case, be a factor to be taken into consideration in determining whether or not a *free* consent was actually given. [Citation.]" (Original italics.) (246 Cal.App.2d at pp. 728-729.)

tary.[8] From these circumstances emerge cogent reasons in support of defendants' claim that Leonard's consent to the search of his car was involuntary as a matter of law. (See *Castaneda* v. *Superior Court* (1963) 59 Cal.2d 439, 442-444 [30 Cal.Rptr. 1, 380 P.2d 641]; *People* v. *Gorg* (1955) 45 Cal.2d 776, 782-783 [291 P.2d 469].) We need not resolve this question for we have concluded on the basis of the record presented to us (see *Thompson* v. *Superior Court* (1968) 262 Cal.App.2d 98, 102-106 [68 Cal.Rptr. 530] *passim*) that the trial court's suppression of the evidence seized in the Pontiac should be upheld since such evidence was the product of the unlawful search and seizure of Mrs. Marsdin. (*Wong Sun* v. *United States, supra*, 371 U.S. 471; *People* v. *Johnson* (1969) 70 Cal.2d 541 [75 Cal.Rptr. 401, 450 P.2d 865]; *People* v. *Sesslin* (1968) 68 Cal.2d 418 [67 Cal.Rptr. 409, 439 P.2d 321]; *People* v. *Haven* (1963) 59 Cal.2d 713 [31 Cal.Rptr. 47, 381 P.2d 927].)

The "fruit of the poisonous tree" doctrine—distilled from a number of decisions of the high court and articulated in *Wong Sun*—rests upon the fundamental thesis that the "exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." (*Wong Sun* v. *United States, supra*, 371 U.S. at p. 485 [9 L.Ed.2d at p. 454].) In its explication of the doctrine, the Supreme Court went on to say "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" (371 U.S. at pp. 487-488 [9 L.Ed.2d at p. 455].) Following *Wong Sun* we held in *People* v. *Sesslin, supra*, 68 Cal.2d 418, that the "state may not use evidence to convict an accused which it obtained by exploiting an illegal arrest or detention. [Citations.]" (68 Cal.2d at pp. 426-427.) We then explained: "That degree of 'attenuation' which suffices to remove the taint from evidence obtained directly as

---

[8]The trial court's order stated: "The subsequent search of the vehicle *consented to by the owner*, was not consented to by the defendant Casebeer . . . ." (Italics added.) Read in context, this cannot be considered a finding that Leonard's consent to the search of the car was voluntary; rather, it indicates that the court assumed it was voluntary but concluded that the search was tainted by the unlawful search of Mrs. Marsdin.

a result of unlawful police conduct requires at least an intervening independent act·by the defendant or a third party which breaks the causal chain linking the ·illegality and evidence in such a way that the evidence is not in fact obtained 'by exploitation of the illegality.'" (68 Cal.2d at p. 428.)

More recently in *People* v. *Johnson, supra,* 70 Cal.2d 541, we dealt with this problem of determining whether the causal chain linking the initial illegality and the evidence secured had been severed. In that case officers obtained from a codefendant a confession to certain burglaries after confronting him with the stolen property which they had seized after an illegal search of his apartment. In the confession, the codefendant implicated Johnson who was arrested but denied involvement. The officers then had the codefendant repeat his confession implicating Johnson in the latter's presence. Johnson, himself, then confessed.

Facing the "apt question" of exploitation posed in *Wong Sun,* we observed that "[i]n considering whether acts occurring between the unlawful activity and the securing of the evidence objected to are sufficient to purge the taint, courts have held that the decisive issue is not that the road from the unlawful search to the testimony is 'long,' but that it is 'straight.' [Citations.]" We reasoned that "where the acts intervening between the defendant's confession and the unlawful search have in fact been induced by the authorities' exploitation of the unlawful search, and where the confession was in fact induced by the authorities' exploitation of those intervening acts, the road from the unlawful search to the confession, even if long, is straight, and adherence to the laudable policies underlying the exclusionary rule requires a conclusion that the confession is the fruit of the unlawful search. To hold otherwise would permit the authorities to profit from their unlawful activity and furnish an incentive for unlawful searches in violation of the Fourth and Fourteenth Amendments in the hope that the direct fruits of the search might be manipulated in such a way as to produce admissible evidence. [Citations.]" (*People* v. *Johnson, supra,* 70 Cal.2d 541, at pp. 548-549.) We held that Johnson's confession was induced by the officer's exploitation of the codefendant's second confession since it followed the latter "'almost immediately in time'" and since the *Miranda* warning given both accused while it "may be a factor in determining whether there is an intervening act of free will, it does not in isolation demonstrate the requisite attenuation." (*People* v. *Johnson, supra,* 70 Cal.2d 541, at p. 551.)

In the case at bench, the People contend that Leonard's consent to the search of the Pontiac was an intervening independent act breaking the connection between the illegal search of Mrs. Marsdin's purse and the evidence secured by a search of the Pontiac so as to purge the latter search of the primary taint inherent in the former. However, as we have already pointed out (see fn. 8, *ante,* and accompanying text), the trial court made no finding that Leonard's consent was freely given or that the People had sustained their burden of so showing (*Castaneda* v. *Superior Court, supra,* 59 Cal.2d 439 and *People* v. *Gorg, supra,* 45 Cal.2d 776). Indeed it appears arguable that the consent was involuntary as a matter of law. Certainly in the light of all the surrounding circumstances, the trial court would have been warranted in inferring that the connection between the illegal conduct of the officer and the discovery of the challenged evidence had not " 'become so attenuated as to dissipate the taint.' " (*Wong Sun* v. *United States, supra,* 371 U.S. 471, 487 [9 L.Ed.2d 441, 445, 83 S.Ct. 407] ; quoting from *Nardone* v. *United States* (1939) 308 U.S. 338, 341 [84 L.Ed. 307, 312, 60 S.Ct. 266].)

It is clear that the unlawful search of Mrs. Marsdin and the finding of marijuana in her purse led Officer Tyrell to the marijuana in the Pontiac. If this were not a valid inference, indeed probably the only reasonable inference, we would remain perplexed as to why a highway patrol officer who had stopped the group for a traffic violation, would want to make a search of the vehicle. Mrs. Marsdin was arrested and placed in the patrol car; Casebeer, the driver, was ordered to the patrol car where he was frisked and then ordered back to the Pontiac and told to stay there; the three members of the group thus remained in the car for a half-hour without being given any explanation. To say that each of the three, including Leonard, was not "deprived of his freedom of action in any significant way" (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 444 [16 L.Ed.2d 694, 706, 86 S.Ct. 1602, 10 A.L.R.3d 974]), would be to shut one's eyes to realities. Finally, upon the arrival of the other officers, Officer Tyrell informed Leonard that Mrs. Marsdin had been arrested because she "was found to have narcotics on her," ordered him out of the car to be searched, and asked "if he cared" if the officer "checked the vehicle."

We do not know whether Leonard would have consented to the search had he not been told that Mrs. Marsdin had been

arrested on a "narcotics" charge. Since he had witnessed the ordering about by the officer of Casebeer and Mrs. Marsdin, the search of the latter and her detention in the patrol car, and since finally after being detained himself for a half-hour he was told that Mrs. Marsdin had been arrested on a narcotics charge; it is reasonable to infer that he believed that he could not withhold his consent to the search of his car. His consent was given upon the officer's somewhat oblique request, after a long unexplained delay and then after additional officers had come on the scene. We do not think that the half-hour interval was a respite which revived and fortified Leonard's freedom to act; quite the contrary, we would think his prolonged detention increased the tension and pressures of his predicament. Paraphrasing *Johnson,* we think that the road from the unlawful search to the search of the Pontiac, even if long, was straight. Significantly, Leonard's consent followed "almost immediately in time," upon Officer Tyrell's announcement to him that Mrs. Marsdin had been arrested for a "narcotics" charge and that he, himself, must alight from the car to be "checked." The prosecution introduced no evidence tending to show that Leonard's consent was not induced by the initial unlawful search and arrest. On the record before us, we cannot conclude that "the connection between the lawless conduct of the [officer] and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.'" (*Wong Sun* v. *United States, supra,* 371 U.S. 471, 487 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].) Rather, we are satisfied that the trial court was warranted in concluding that the connection had not been broken and that the challenged evidence had been obtained by exploiting the illegal arrest and search of Mrs. Marsdin. Fulfilling our responsibility of "appellate review of the ruling" (Pen. Code, § 1538.5, subd. (o)) suppressing such evidence "we cannot say that the trial court did not have substantial evidence in the record justifying the rulings made. . . ." (*People* v. *Superior Court* (1968) 264 Cal.App.2d 165, 166 [70 Cal.Rptr. 362].)

The alternative writ of prohibition and mandate is discharged; the petition for a peremptory writ of prohibition and mandate is denied.

Traynor, C. J., Peters, J., and Tobriner, J., concurred.

MOSK, J.—I concur in the order.

I feel obliged to point out, however, that this case differs

significantly from *People* v. *Sesslin* (1968) 68 Cal.2d 418 [67 Cal.Rptr. 409, 439 P.2d 321], and *People* v. *Johnson* (1969) 70 Cal.2d 541 [75 Cal.Rptr. 401, 450 P.2d 865], upon which the majority here rely. In both of those cases the trier of fact impliedly found there had been no exploitation of the purported initial illegality and admitted evidence of subsequent events. Nevertheless the majority of this court undertook in each instance to independently assess the evidence, to reweigh the facts, and to conclude that the taint of illegality had not been dissipated by an intervening act. (See my dissents in *Sesslin*, 68 Cal.2d at p. 431, and in *Johnson*, 70 Cal.2d at p. 558.)

As in *Sesslin* and *Johnson*, in this case the evidence was conflicting. The trial court could have found an independent intervening act sufficient to remove the taint of original illegality in the consent given by the owner of the vehicle. The consent, plus the suspicious circumstances of an occupant apparently under the influence of a drug, the recent entry of the group from across the international border, and the absence of identifying papers in the possession of any of the party, could have justified the search of the vehicle resulting in discovery of contraband.

Nevertheless the trial court found as a fact that the original illegality permeated the subsequent events and that the causal chain remained unbroken from the first to the later actions of the authorities. Thus the majority need not rely on *Sesslin* and *Johnson*, in which this court—erroneously, in my opinion —undertook to reverse factual determinations of trial courts. I would merely hold that we are bound by the factual finding made by the trial court here and would affirm solely on that ground.

McComb, J., and Burke, J., concurred.