[L.A. No. 29872. In Bank. Feb. 29, 1972.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
STANLEY CHARLES JOHNSON et al., Real Parties in Interest.

**COUNSEL**

Joseph P. Busch, Jr., District Attorney, Harry Wood and Arnold T. Guminski, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Richard S. Buckley, Public Defender, James L. McCormick, G. Keith Wisot and Harry W. Brainard, Deputy Public Defenders, Burton Marks, Marks, Sherman, Schwartz & Levenberg and Marks, Sherman & London for Real Parties in Interest.

**OPINION**

**McCOMB, J.**—The People seek a writ of mandate to compel respondent court to annul that portion of an order which suppressed some of the

evidence in a case in which six defendants (real parties in interest herein) were variously charged with violations of section 4463 of the Vehicle Code (possession of forged or altered license), section 475 of the Penal Code (possession of forged bill), section 472 of the Penal Code (counterfeiting seal of California), and section 484e, subdivision (2), of the Penal Code (possession of lost or stolen credit card).

*Facts:* The Los Angeles County Sheriff, Special Units Bureau, Forgery, conducted an investigation of a group of individuals suspected of forging drivers' licenses and dealing in stolen credit cards. On December 22, 1969, the Municipal Court for Los Angeles Judicial District issued a warrant to search three locations: (1) 711 Lillian Way, Apt. 3, Hollywood, (2) 620 West 41st Place, Los Angeles, and (3) 3130 West 59th Street, Los Angeles. Certain items were taken from each of the three locations by law enforcement officers on December 23, 1969. Defendants were thereafter indicted, and criminal proceedings were commenced against them in respondent court, which proceedings were consolidated for trial.

Defendants moved, pursuant to section 1538.5 of the Penal Code, to suppress the seized evidence, on the ground that it had been obtained as a result of an unreasonable search and seizure. Respondent court upheld the warrant with respect to the first location, but held that the affidavit supporting the warrant was not legally sufficient with respect to the second and third locations.

The affidavit was made by Sergeant D. P. James, of the Los Angeles Sheriff's office. With respect to the third location (59th Street), it reveals the following:

"On November 28, 1969 . . . and on various subsequent occasions thereafter, terminating on 12/19/69 your affiant received the following information from Samella Germany . . . a fellow deputy sheriff, that on 11/26/69 a male negro known only as 'Levy' advised said deputy sheriff . . . that he could secure for her counterfeit or fictitious California drivers licenses, that on same date Deputy Germany gave said 'Levy' photographs and a description of herself for said 'Levy' to secure a counterfeit California drivers license under the name of Carol Oliver; that on 12/1/69 Deputy Germany met the aforesaid 'Levy' and he turned over to her a counterfeit California drivers license, bearing the Deputy's picture on it and bearing the name Sharon Bloom, License No. R-389165; that said 'Levy' stated he received the license from Clifford McDaniel, on the evening of 11/30/69 and further stated that McDaniel was out of blank California drivers licenses forms and had used the picture of Deputy Germany on a previously counterfeited license with a name and description

of a Sharon Bloom. 'Levy' also stated that he was directed by McDaniel to go to 3130 West 59th Street, Los Angeles and secure from a male negro named 'Stanley' some blank California drivers licenses; that said 'Levy' did comply with the instruction of Clifford McDaniel and met 'Stanley' and that 'Stanley' advised 'Levy' that he could make drivers licenses for him anytime.

"That on 12/2/69 Deputy Samella Germany . . . advised 'Levy' that she needed a new drivers license as the one in the name of Sharon Bloom did not fit her description; that 'Levy' made a telephone call stating that he was talking to Clifford McDaniel and that McDaniel requested them to contact him after 9:00 a.m. At approximately 9:15 p.m. on 12/2/69, Deputy Germany, accompanied by the person named 'Levy' proceeded to 711 Lillian Way, Apt. 3, Hollywood, California . . . . Deputy Germany entered the premises with 'Levy' and was introduced to Clifford McDaniel . . . .

". . . . . . . . . . . . . . . . . . . . .

"At approximately 10:15 p.m. on 12/2/69 while still at the aforesaid 711 Lillian Way, Hollywood . . . Deputy Germany was shown by 'Levy' " a counterfeit Pacific Telephone Payroll check and advised by Clifford McDaniel that a 'Stanley' Johnson was handling them and that if they needed any more people to pass them that they would let her know.

"That on 12/5/69 at approximately 11:30 a.m. Deputy Germany phoned Clifford McDaniel . . . advising . . . that [she] needed a new drivers license to match the name of Virginia C. Johnson . . . . At approximately 4 p.m., Deputy Germany . . . recontacted Clifford McDaniel and was advised to go to Ralphs Market at 59th Street and Crenshaw Boulevard and call him from there. At approximately 5:30 p.m., Deputy Germany called Clifford McDaniel from 59th and Crenshaw Boulevard and was advised by McDaniel that she would be met by 'Stan' giving her 'Stan's' description. At approximately 5:35 p.m. Deputy Germany was approached by a male negro . . . who identified himself as 'Stan.' Deputy Germany gave 'Stan' the photographs of herself and a description that was to appear on the drivers license with the name of Virginia Johnson. 'Stan' stated it would take approximately 20 minutes for him to return with the license. At approximately 6:15 p.m. 'Stan' returned to the market, handed Deputy Germany a counterfeit California Drivers license in the name of Virginia C. Johnson, No. H 798906 and requested and was given $35.00 by Deputy Germany. 'Stan' asked Deputy Germany how many licenses she usually needed and was told that she used two or three a week. 'Stan'

then stated that he had some of the new license forms with the State seal on the front and stated that he would take care of her for licenses and gave her his telephone number (295-7934, registered to Charles Johnson, 3130 59th Street, L.A.) to call when she needed another license.

"At approximately 9:00 a.m. on 12/9/69, Deputy Germany phoned 'Stan' at 295-7934 and told him that she had a new credit card and needed another drivers license in the name of Harriett L. Smith. 'Stan' stated that he was busy right then and for Deputy Germany to contact Clifford McDaniel who would contact him, Stan, about 10:30 or 11:00 a.m. to have him make up the license. [Thereafter, following further developments, Deputy Germany obtained a driver's license from McDaniel at the Lillian Way address.]

". . . An investigation was made through the Special Operator, Pacific Telephone Company, for the location 3130 West 59th Street, telephone number 295-7934 . . . and ascertained that said number was issued to Charles Johnson located at 3130 West 59th Street, Los Angeles."

In holding the affidavit insufficient with respect to the 59th Street location, respondent court found "that there were insufficient facts . . . related in the Affidavit, to justify the issuance of the search warrant. The Court realizes that Levy's statement that he had procured blank drivers' licenses at that address from Stanley is in the Affidavit on page 2-A; *there is no spelling out of a date with any sufficiency as to when this occurred* or as to how many licenses were seen, how many blank licenses were seen. There is no [*sic*] anything of a factual nature related sufficiently to justify a person of ordinary caution and prudence to believe the property would be at 3130 59th Street. The Court realizes that Levy, at the time the Affidavit was made, or at the time that the negotiations were going on with him, the information was being received from him, had probably been reinforced even though he was unreliable to begin with to such an extent by the deputies, Deputy Germany's investigations and activities, that he could probably have been relied upon. But there are not sufficient facts related in Levy's statements to justify the belief that the property was at 3130 59th Place *at any given time*." (Italics added.)

With respect to the second location (West 41st Place), the affidavit reveals the following: About 4 p.m. on December 16, 1969, the affiant (Sergeant James) received information from a "confidential informant" that "Stanley Johnson was aware that his residence at 3130 West 59th Street, Los Angeles was under observation by law enforcement officers and subsequently moved all or part of his equipment used in the making of false identification, to 620 West 41st Place, Los Angeles, upstairs, the

downstairs being vacant. He further stated that the persons residing at that location were known to him as 'T.J. and Betty.' The informant further stated that he observed blank checks, blank driver's licenses and fluid used in the operation of making driver's licenses, at 41st Place, Los Angeles." The affiant alleged that the confidential information was considered reliable on the basis that, "In the past this informant has given to your affiant on 1 separate occasions [sic] that one Jacqueline Wolf was wanted for forgery by the Beverly Hills Police Department and that she resided at 4786 Don Miquel, Apt. 3, Los Angeles," and that the affiant had verified this information to be correct and accurate. The affidavit recited that the information had led to the arrest of a person wanted for forgery, but that the arrest had not resulted in anyone's being held to answer or convicted, "as neither the preliminary hearing or trial has yet been held."

With respect to the 41st Place location, respondent court found the place and the property sufficiently described[1] but found "that there were insufficient facts to indicate the reliability of the informant . . . . [N]o past experience is related in connection with the alleged reliability of the informant. There are no personal observations to support the conclusion reached by the informant that the property was [there] . . . I think there was insufficient personal knowledge set forth on the part of the informant . . . . The informant told the affiant that Stanley Johnson was aware that his residence at 3130 West 59th Street [was under observation] . . . that is obviously a conclusion of the informant . . . . There is no setting forth that Johnson made a statement to that effect. There is no setting forth of any facts which would support what the informant had said such as that the informant observed the property being moved . . . . [T]he informant stated that he observed blank drivers' licenses . . . at 41st Place, but he does not say when he observed them . . . . [H]is statement that the fluid was used . . . seems to me to be conclusionary. So I don't think that the test, the two-prong test set out in Aguilar versus Texas [378 U.S. 108 (12 L. Ed.2d 723, 84 S.Ct. 1509)] has been met in respect to the seizure of property at 41st Place."

Question. *Was the affidavit legally sufficient with respect to the 59th Street and 41st Place locations?*

*Yes.* ■ Under section 1538.5, subdivision (i), of the Penal Code, a defendant is entitled to a hearing de novo in the superior court with respect to the adequacy of a search warrant. (See *People* v. *Harrington,* 2 Cal.3d 991, 995-996 (3) [88 Cal.Rptr. 161, 471 P.2d 961].) However,

---

[1]The search warrant authorized a search of "the top floor of the premises located and described as 620 West 41st Place, Los Angeles, being a two-story, 2-family residence . . . ." The correct street number for the top floor is 620½.

the superior court is required, even at such a hearing, to give a common-sense interpretation to the affidavit on which the warrant was based. As stated by the Supreme Court of the United States in *United States* v. *Ventresca,* 380 U.S. 102, 108-109 [13 L.Ed.2d 684, 688-689, 85 S.Ct. 741]:

"If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants . . . must be tested and interpreted by magistrates *and courts* in a commonsense and realistic fashion. They are normally drafted by non-lawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

"This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based. [Citation.] Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, *the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.* Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." (Italics added.) (See also *United States* v. *Harris,* 403 U.S. 573 [29 L.Ed.2d 723, 91 S.Ct. 2075].)

■ In order for an affidavit based on an informant's hearsay statement to be legally sufficient to support the issuance of a search warrant, two requirements must be met: (1) The affidavit must allege the informant's statement in language which is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matters contained in the statement; and (2) the affidavit must contain some underlying factual information from which the magistrate issuing the warrant can reasonably conclude that the informant was credible or his information reliable. (*Skelton* v. *Superior Court,* 1 Cal.3d 144, 152 [81 Cal.Rptr. 613, 460 P.2d 485]; *People* v. *Hamilton,* 71 Cal.2d 176, 179-180 [77 Cal.Rptr. 785, 454 P.2d 681].) ■ Although information provided by even an anonymous informer is relevant on the issue of reasonable cause, evidence

must be presented to the court to justify the conclusion that reliance on the information was reasonable. In some instances, the identity of, or past experience with, the informer may provide evidence of the reliability of the information; in others, it may be supplied by similar information from other sources or by the personal observations of the police. (*People* v. *Scoma,* 71 Cal.2d 332, 337-338 [78 Cal.Rptr. 491, 455 P.2d 419].) ■ Even though information from an informer is expressed in conclusionary language, and there is no showing why the informer is believed to be reliable on the basis of past experience, a magistrate may properly issue a warrant on the basis of such information if the supporting affidavit also recites facts indicating that reliance on the information is reasonable. (*People* v. *Flores,* 68 Cal.2d 563, 564-566 [68 Cal.Rptr. 161, 440 P.2d 233]; see *People* v. *Benjamin,* 71 Cal.2d 296, 302, fn. 4 [78 Cal.Rptr. 510, 455 P.2d 438].)

With respect to the 59th Street location, respondent court did not question the reliability of the informers who gave the information contained in the affidavit, but made its determination solely on the basis of its finding that there were insufficient facts in the affidavit to justify issuance of the search warrant. The principal basis for respondent court's ruling was that "there is no spelling out of a date with any sufficiency when this occurred [Levy's going to the 59th Street location to obtain blank driver's license forms from Stanley, in accordance with McDaniel's instructions] [and] there are not sufficient facts related in Levy's statements to justify the belief that the property was at 3130 59th Place at any given time."

■ If the facts stated in the affidavit are interpreted in a commonsense manner, however, the only reasonable inference therefrom is that Stanley prepared false identification documents and was keeping equipment needed therefor at the 59th Street location, which, as shown by the search warrant itself, was Stanley's residence. Significantly, the 59th Street location is a relatively short distance from Ralph's Market at 59th Street and Crenshaw Boulevard, where, it will be recalled, "Stan" delivered a counterfeit driver's license to Deputy Germany. Under a commonsense interpretation of the affidavit, it is clear that on December 1, 1969, Levy told Deputy Germany that on November 30, 1969, he had received from Clifford McDaniel a counterfeit driver's license in the name of Sharon Bloom, to be given to Deputy Germany in place of the one she had ordered in the name of Carol Oliver; that at the time Levy saw McDaniel, McDaniel stated that he was out of blank driver's license forms (thus explaining why one previously counterfeited under a different name was given to Deputy Germany) but that Stanley then had some at the 59th Street location, and Levy should secure some of the forms from Stanley; and that following Levy's conversation with McDaniel on November 30, 1969, and before his conversation

with Deputy Germany on December 1, 1969, he had gone to the 59th Street location and met Stanley, who advised him that he could make drivers' licenses for him any time.

Respondent court's conclusion that the affidavit was insufficient because the date on which Levy went to the 59th Street location is not spelled out could be reached only by interpreting the affidavit in a hypertechnical manner, which is exactly what the Supreme Court of the United States condemned in *Ventresca*.

From respondent court's statement at the time it ruled on the sufficiency of the affidavit as it relates to the 41st Place location, it appears that respondent court once again adopted a hypertechnical approach. Concededly, the confidential informant's statements regarding Stanley Johnson are conclusionary in nature (see *People* v. *Hamilton, supra,* 71 Cal.2d 176; *People* v. *Benjamin, supra,* 71 Cal.2d 296); and reference to a "fluid used in the operation of making driver's licenses" may constitute an opinion without any foundation that the informant was qualified by his own experience to form an opinion as to the function or purpose of the fluid. However, from the affidavit it clearly appears that the confidential informant observed blank checks and blank drivers' licenses in addition to the fluid; and the total information should, under the rule hereinabove stated, be given a commonsense interpretation.

It is true, as pointed out by respondent court, that the affidavit does not state *when* the confidential informant made his observations. But in reading the affidavit in a commonsense manner, the magistrate could reasonably have inferred that in the light of the affidavit considered as a whole the informant's observations took place within a reasonably short time before he communicated with the police on December 16, 1969. It will be recalled that the affidavit recites the activities, commencing on November 26, 1969, of Deputy Germany as a feigned accomplice and states facts from which it is reasonable to infer that Stanley Johnson was then engaged in the preparation of false identification documents at the 59th Street location. From the fact that Deputy Germany telephoned Stanley Johnson at the 59th Street location around 9 a.m. on December 9, 1969, and spoke with him, it is reasonable to conclude that he was still conducting operations at that address at that time. Consequently, the magistrate could have concluded that the move revealed by the informant's information took place some time after December 9, 1969, and prior to December 16, 1969, and that it was at some time during such period that the informant made his observations.

█ The affidavit had to contain facts showing the reliability or credibility of the confidential informant, but his reliability would appear to have

been established by the detailed nature of his observations and by coroborating information about the 59th Street address. (See *People* v. *Scoma, supra,* 71 Cal.2d 332, 337-338 [7].) Moreover, the fact that he had previously given information which led to the arrest of a forgery suspect is additional justification for regarding him as a reliable informant. Although this was not so strong a showing as would be the case where the person arrested has been held to answer or convicted, the affidavit contained an explanation that no preliminary hearing or trial had taken place; and the fact that the arrest was made and the charges had not been dismissed would constitute some substantiation of the informant's reliability. (See *People* v. *Cedeno,* 218 Cal.App.2d 213, 221 [32 Cal.Rptr. 246] [7]; *People* v. *Roland,* 183 Cal.App.2d 780, 784 [3] [6 Cal.Rptr. 895].)

Because of the conclusionary statements regarding Stanley Johnson, there is some question whether the affidavit showed probable cause to search the 41st Place location. However, as pointed out above, the affidavit stated that the confidential informant had personally observed at that location certain materials used in the production of false documents, and an inference can be drawn that his observations were made within a week or 10 days prior to the execution of the affidavit. Under the rule laid down in *Ventresca* quoted above, "the resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants." Although some doubt exists with respect to the adequacy of the affidavit as it relates to the 41st Place location, sufficient facts are included to justify resolving the doubt in favor of the magistrate's finding of probable cause with respect to the 41st Place location, as well as the other two locations.

Testimony that the officers did not announce their purpose before breaking open the doors to the respective locations is pointed to, and it is contended that, as a result, the officers entered without complying with section 1531 of the Penal Code. There is evidence, however, that the officers did give notice of their authority and purpose. With respect to the entry at the 59th Street location, Deputy Sheriff John T. Corbett testified that he was at the side door and that entry was made at the front door. He was asked, "While you were at the side door could you hear anything being said by either Sergeant James or any of the other officers there?" He answered: "Yes, sir. Coming from the front part of the building . . . I could hear them say, 'Sheriff's officers. We have a warrant. Open the door.'" With respect to entry at the 41st Place location, Deputy Sheriff Richard M. Frost testified that he rang the doorbell and knocked several times; that someone said to wait a moment; that he said, "Sheriff's officers, we have a search warrant. Will you please open the door?"; that he waited, but no

one opened the door; that he said a second time, "Sheriff's officers. We have a warrant, a search warrant. Will you please open the door?"; and that about five minutes after his first announcement the officers forced their way in.

Let a peremptory writ of mandate issue directing respondent court to annul that portion of its order of December 24, 1970, in cases A-254130 and A-261388, which suppressed evidence seized at 3130 59th Street and 620½ 41st Place.

Wright, C. J., Mosk, J., and Burke, J., concurred.

**TOBRINER, J.,** Dissenting.—The issue in this case is whether the order of the superior court suppressing the items seized from the 41st Place and 59th Street residences is supported by substantial evidence. A review of the record before the superior court demonstrates that the evidence, and inferences reasonably derived from that evidence, is sufficient to sustain the superior court's determination.

Section 1538.5, subdivision (i) expressly endows the defendant with the right to obtain a determination of the superior court as to "the validity of a search or seizure *de novo* on the basis of the evidence." (Italics added.) Our task is therefore to review the determination of the superior court in order to find whether substantial evidence in the record supports the rulings of the superior court. (*People* v. *Superior Court* (1969) 71 Cal.2d 265, 274 [78 Cal.Rptr. 210, 455 P.2d 146]; *People* v. *Superior Court* (1970) 9 Cal.App.3d 203, 209 [88 Cal.Rptr. 21]; *People* v. *Superior Court* (1970) 3 Cal.App.3d 476, 488 [83 Cal.Rptr. 771]; *Bergeron* v. *Superior Court* (1970) 2 Cal.App.3d 433, 436 [82 Cal.Rptr. 711]; *People* v. *Superior Court* (1968) 264 Cal.App.2d 165, 166 [70 Cal.Rptr. 362]. Clearly we do not perform the role of a trial court here and preside over a third *de novo* hearing of the issue.)[1]

I now turn to a review of the evidentiary record before the superior court. In such a review, we must observe the well-established principle that in an appellate proceeding "all conflicts must be resolved in favor of the respond-

[1]The language of the *United States* v. *Ventresca* (1965) 380 U.S. 102, 109 [13 L.Ed.2d 684, 689, 85 S.Ct. 741], that "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants," would appear to state a principle for the trier of fact, not a standard of appellate review. Once the trier of fact has made its finding of fact, federal appellate courts do not reverse that finding unless they adjudge it to be "clearly erroneous." (*Jackson* v. *United States* (1965) 353 F.2d 862, 864-865 [122 App.D.C. 324]; 3 Wright, Federal Practice and Procedure (1969) p. 130; see *United States* v. *Montos* (5th Cir. 1970) 421 F.2d 215, 219, fn. 1.)

ent, and all legitimate and reasonable inferences indulged to uphold the findings of the trial court if possible." (*Leonard* v. *Rose* (1967) 65 Cal.2d 589, 593 [55 Cal.Rptr. 916, 422 P.2d 604].) By the same token, this court is bound to reject any inference contrary to the finding of the trial court unless on the record such contrary inference is the only one which can reasonably be drawn. (See *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 72 [64 Cal.Rptr. 785, 435 P.2d 553].)

We begin with the asserted justification for search of the 59th Street residence. The affidavit of Sergeant James of the Los Angeles Sheriff's office shows that defendant, Stanley Johnson, who was engaged in forging and selling drivers' licenses, lived at that address, that Deputy Germany bought a forged license from Stanley at Ralph's Market, and that Ralph's Market was located near the 59th Street residence. Finally, the record shows that on one occasion Levy, a probably reliable informer, talked to Stanley at that address, and Stanley told Levy that Stanley could get licenses for Levy. One could reasonably infer from the affidavit that (a) on that occasion Stanley supplied Levy with blank license forms, and (b) this transaction took place on November 30 or December 1 of 1969. The record, however, does not *compel* such inferences, and in fact, while the trial court drew inference (a), it declined to draw inference (b), stating that "there is no spelling out of a date with any sufficiency as to when this occurred."

The fact that Johnson lived at 3130 West 59th Street, and engaged in criminal activity near that place, is plainly not enough to justify a search of his residence. If we add the fact that at some uncertain date, possibly long before the date of the affidavit, Levy received license blanks at the 59th Street address, we have an additional fact supporting the possible inference that Levy saw those blanks during the month preceding the search, and perhaps that the blanks were still on the 59th Street premises. But the trial court could *reasonably refuse* to draw those inferences, and insist upon a greater measure of specificity in the affidavit to justify the search.

Turning now to the search of the 41st Place location, we again find substantial evidence to support the superior court's finding. This search rested on information given to Sergeant James by an unnamed and undescribed informant of unproven reliability. The information was that "Stanley Johnson was aware that his residence at 3130 West 59th Street, Los Angeles was under observation by law enforcement officers and subsequently moved all or part of his equipment used in the making of false identification, to 620 West 41st Place, Los Angeles, upstairs, the downstairs being vacant. He further stated that the persons residing at that location were known to him as 'T.J. and Betty.' The informant further stated that he observed

blank checks, blank drivers' licenses, and fluid used in the operation of making drivers' licenses, at 41st Place, Los Angeles."

The majority opinion ackowledges that the affidavit must contain facts to show the reliability of the informant, but asserts that "his reliability would appear to have been established by the detailed nature of his observations and by corroborating information about the 59th Street address." (*Ante,* pp. 713-714.) The majority correctly observe, however, that the informant's statements regarding Stanley Johnson are conclusionary (*ante,* p. 713) and that his reference to fluid used in making licenses may constitute an opinion which the informant was not qualified to render. (*Ante,* p. 713.) We are left with the assertions that Johnson moved "all" *or* "part of his equipment" to 41st Place, that T.J. and Betty live there, and that the informant saw blank checks and licenses. The informant does not tell us specifically what equipment was moved. He provides no surnames or descriptions for T.J. and Betty. He does not state when he saw the blank checks and licenses. His affidavit, in sum, is not the precise and detailed account of a careful observer. (Cf. *Draper* v. *United States* (1959) 358 U.S. 307 [3 L.Ed.2d 327, 79 S.Ct. 329].)

As for corroboration, all that the informant said about the 59th Street address is that Stanley knew the police were watching that address and moved all or part of his equipment elsewhere; the record contains nothing to corroborate either statement. Nor is there any corroboration for the informant's assertions respecting the 41st Place location.

The affidavit averred that the informant had previously given information which led to the arrest of a forgery suspect. The affidavit does not assert that the suspect had been convicted, or that the information supplied had been verified in any other fashion. Certainly the fact that the informant had once supplied the police with data of uncertain reliability does not transform him into a witness of established reliability.

The majority opinion states that "there is some question whether the affidavit showed probable cause to search the 41st Place location" (*ante,* p. 17), but concludes that doubtful or marginal cases should be resolved in favor of upholding the warrant. This conclusion mistakes the function of an appellate court in reviewing a determination under Penal Code section 1538.5. Since the findings of the superior court must be upheld if supported by substantial evidence, including all reasonable inferences which can be drawn in support of those findings, doubtful or marginal cases are not resolved for or against the warrant—they are resolved *in favor* of the determination of the superior court.

I submit that the majority opinion distorts the role of this court in hold-

ing that it should reverse the ruling of the superior court, despite the fact that the holding is supported by substantial evidence. The result of such misconception of our function will be to plunge an overburdened court into the task of upsetting rulings based upon substantial evidence—a twisting of the decisions, the statute and the synchronization of the judicial tribunals.

I conclude that the affidavit was clearly insufficient to justify search of the 41st Place location. The search of the 59th Street residence is somewhat closer, but, in accord with the accepted principles of appellate review under section 1538.5, I would resolve both issues in favor of affirming the determination of the superior court to suppress the evidence seized at those locations.

Peters, J., and Sullivan, J., concurred.

The petition of real parties in interest Johnson and Crowder for a rehearing was denied March 30, 1972. Peters, J., Tobriner, J., and Sullivan, J., were of the opinion that the petition should be granted.