[Civ. No. 33498. First Dist., Div. Four. Jan. 9, 1974.]

MARY CHRISTINE BOWYER et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CRUZ COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Robert C. Selvidge, Russell E. Parsons and Sidney P. Lester for Petitioners.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, Doris H. Maier and Edward P. O'Brien, Assistant Attorneys General, W. Eric Collins, Linda Ludlow and Sanford Svetcov, Deputy Attorneys General, for Respondent and for Real Party in Interest.

## OPINION

**RATTIGAN, J.**—We hold in this proceeding that certain evidence must be suppressed because a so-called "telephonic search warrant," pursuant to which the evidence was seized, was wholly invalid in the absence of a writing as prescribed by statute.

A three-count information filed in respondent court jointly charged petitioners Chester and Mary Bowyer, Keith Robinson and James Thomason with possession of two contraband substances (LSD and a methylenedioxy amphetamine) in violation of Health and Safety Code section 11350, and with possession of marijuana in violation of section 11357. The information alleges that all the offenses charged occurred on April 22, 1973,[1] when the contraband was seized in the search of residential premises as hereinafter described.

Petitioners moved respondent court for an order suppressing the evidence pursuant to Penal Code section 1538.5, subdivision (a).[2] The motion having been denied after an evidentiary hearing, they seek a "writ of prohibition and/or mandate" as permitted by subdivision (i) of section 1538.5. We issued an appropriate alternative writ.

The record made at the hearing on petitioners' motion supports the following recital of facts: At pertinent times, Michael Barnes, a special agent of the United States Department of Justice, was working on assignment with the State Bureau of Narcotic Enforcement. In mid-April, he learned from the Federal Bureau of Investigation that petitioners Chester and Mary Bowyer were fugitives by reason of federal warrants for their arrest.[3] An

---

[1] All dates mentioned herein refer to the calendar year 1973.

[2] Unless otherwise indicated, all statutory references herein are to the Penal Code.

[3] The federal warrant for the arrest of petitioner Mary Bowyer referred to her as "Mary Christine Mari."

informant told Barnes that Chester Bowyer was living on a ranch in Santa Cruz County and that petitioner Robinson, another "fugitive," might also be living there. An investigation indicated that the telephone at the ranch was listed in the name of a person who was suspected of harboring still other "fugitives" thought to be with Robinson.

Barnes visited the ranch twice for surveillance purposes, once by himself and once with three other law enforcement officers. On the second occasion, on April 21, the officers saw Chester and Mary Bowyer moving about the place and walking in and out of two dwellings located there. Two parked automobiles were also observed on the premises. Because of the prospect that several fugitives were living there, and because the rural terrain could permit the escape of some of them unless the ranch were surrounded by a sufficient number of officers, Barnes decided to execute the Bowyer warrants in a large-scale raid which he scheduled for an early morning hour on April 22, a Sunday.

At a briefing session conducted prior to the raid, Barnes asked Christopher C. Cottle, assistant district attorney for Santa Cruz County, what he (Barnes) should do if the raiding officers found contraband on the ranch while arresting the Bowyers. Cottle told him that a "telephonic search warrant would be in order" in that event, and that Sergeant Asbury (a deputy sheriff and a member of the raiding party) "was familiar with the procedure" to be followed in obtaining such "warrant."

Shortly before 6 a.m. on April 22, and pursuant to plan, approximately 14 law enforcement officers converged on the ranch. None of them had a warrant to search the premises or to arrest anyone.[4] After the two dwellings on the ranch had been surrounded, Agent Barnes knocked on a door of one ("the southern house") and called out "Police officer; we have an arrest warrant for Chester Bowyer and demand entrance; open the door." After 30 seconds or so, an officer called from the rear of the southern house that someone was leaving it through a window. Barnes immediately tried the door, found it locked, directed another officer to force it open, and entered the house. He saw petitioner Thomason coming away from an open window, identified himself, and ordered Thomason detained.

Barnes then went to another outer door of the southern house. Petitioner Chester Bowyer opened this door as Barnes approached it, and was placed

---

[4]It bears mentioning here that the officers could validly arrest the Bowyers on April 22, pursuant to the outstanding federal warrants, without having either warrant in their possession. (§ 842; Witkin, Cal. Criminal Procedure (1963) § 108, par. [b], p. 107.) Petitioners do not contend to the contrary.

under arrest. Barnes arrested petitioner Mary Bowyer, inside the southern house, immediately thereafter.

Simultaneously with Barnes' knock and announcement at the first door of the southern house, State Narcotics Agent Duncan knocked on a door of the other residence ("the northern house," which was immediately nearby) and called "Police officers, we have an arrest warrant for Chester Bowyer, demand entrance [sic]." The door swung open to his knock, whereupon he repeated the announcement and entered the house with Sergeant Clair. No one was inside but, between them, the officers detected a strong odor of marijuana and saw, in plain view in the living room, burning candles and cigarettes, marijuana cigarettes and roaches, and a piece of hashish. Noting an open window, Sergeant Clair went outside to look for fugitives. Shortly thereafter, he apprehended petitioner Robinson under circumstances suggesting that the latter was in flight from the northern house.[5] After Robinson had been returned to the dwelling area, Barnes placed all four petitioners under arrest for possession of the contraband which had been observed in the northern house.

In the course of these events, the officers made limited searches of both houses for the purpose of discovering whether other suspects were present. None were found, and the officers saw no contraband other than the items which had been observed as mentioned above. Because of the discovery of those items, Barnes decided that a thorough search of the premises was necessary and that he should obtain a "telephonic search warrant" for that purpose as previously suggested by Assistant District Attorney Cottle. After conferring with Sergeant Asbury concerning the procedure, and using the ranch telephone, Barnes called Cottle in Santa Cruz, recounted the events of the morning, and described the physical layout of the ranch. The two had a "lengthy discussion, talking in terms of probable cause." Cottle told Barnes to have Sergeant Asbury set up a three-way "conference call" among Barnes, Cottle, and the local magistrate. Cottle then telephoned the magistrate and alerted him to the impending call.

Asbury arranged and tape-recorded the conference call. It commenced at 7:45 a.m. on April 22, approximately two hours after the officers had arrived at the ranch. According to a transcript of Asbury's tape as made later and received in evidence at the hearing, the call consisted of questions or statements by the magistrate and responses by Barnes. It commenced with the following exchange:

[5]One of these circumstances was the open window mentioned. The others: Robinson was wearing pajamas and riding a bare-backed horse at a full gallop.

"[By the magistrate:] . . . [Name] . . ., Municipal Court Judge for Santa Cruz County is on this line, along with Chris Cottle, Asst. District Attorney for Santa Cruz County. I will ask you some questions Mr. Barnes, if you would try as best you can to answer the questions please.

"Mr. Barnes, do you swear that the information you've gotten together is true to the best of your knowledge?

"[By Barnes:] Yes your honor, I do.

"All right, Mr. Barnes, please state your full name and occupation.

"Yes sir, my full name is Michael Allan Barnes. I'm a Special Agent for the Department of Justice, assigned to the Bureau of Narcotic Enforcement for the State of California.

"All right, did you, in the company of some Santa Cruz County Sheriff's officers and federal officers, go to a location in Felton, Santa Cruz County, this morning?

"Yes sir.

"Would you describe where that location is?

"Yes sir . . ."

Continuing, Barnes gave the magistrate a detailed account of his previous investigation of the Bowyers and the ranch, and of everything that had occurred on the premises from the time of the officers' arrival there on that morning. His recital included a detailed description of the ranch and the dwellings, of two automobiles which had been observed on the premises, and of his qualifications to identify marijuana at sight. The conference call concluded with this exchange:

"[By the magistrate:] All right, I take it you are asking for a warrant for the search of all of these premises you described?

"[By Barnes:] Yes sir, I'd like to search all of these premises and the out-buildings for marijuana and for items used to process marijuana for sale, or for personal use, documents that show residency, ownership, possession and markers showing sales in relationship with other subjects for the purpose of sale and the processing of marijuana.

"With regard to the two vehicles that you have described, do you also wish to search those?

"Yes sir.

"Just for review, one is a white Dodge, license #ORN-116, Nevada license and the other is a blue Volkswagon station wagon, California license #TJE-374.

"Yes sir, that's correct.

"All right, *you have a right to search the premises as described* for the items mentioned and any other items of contraband that you find thereto.

"All right your honor, thank you.

"That includes cars too. All right, *if you'll affix my name please to the search warrant,* that will be filed with the court along with a transcript of this recording." (Italics added.)

In a thorough search of both houses and other areas on the ranch, conducted immediately after conclusion of the conference telephone call and pursuant to the magistrate's authorization to search as orally granted therein, the officers found and seized some of the contraband involved in the possessory charges pending against petitioners and challenged on their motion to suppress in respondent court.[6]

On April 23 (the day after the raid), Sergeant Asbury's tape of the three-way conference call was transcribed in typewriting and the transcript (five pages plus a signature page) was incorporated into an "Affidavit For Search Warrant" which Barnes signed as "affiant." Also on April 23, the magistrate signed a written search warrant upon which he wrote "Dated April 23, 1973 nunc pro tunc as of April 22, 1973." A date-stamp on both documents indicates that they were "Filed" in the magistrate's court on the morning of April 25. On May 2, the magistrate authenticated the transcript portion of the "affidavit" by writing on it "I certify that the foregoing transcript is correct. [Signature] Judge May 2, 1973." These matters ap-

---

[6]The only contraband actually described at the hearing on the motion was the marijuana and hashish found in plain view when the officers first entered the northern house. The record shows that other contraband items were seized in the search which followed as authorized by telephone, but it does not describe the other items or the circumstances attending their discovery. (These facts were presumably shown at petitioners' preliminary examination, but the transcript thereof was not received in evidence on the motion.) It was agreed at the hearing that the motion reached the other items; for this reason, and because we hold that mandate must issue as to those items alone (as will appear), respondent court must identify them as hereinafter ordered.

pear in the "affidavit," and a portion of the written search warrant, as simulated in the margin.[7]

### Petitioners' Miscellaneous Contentions

We first discuss three points, raised by petitioners, which do not directly involve the "telephonic search warrant."

---

[7]In the reproductions which follow, we have made minor editorial changes and some deletions (as indicated); we have also shown handwritten words by underscoring. Thus edited, the "affidavit" reads:

"FILED
MUNICIPAL COURT
SANTA CRUZ CO.
JUDICIAL DIST.
1973 APR 25 AM 9:10

"IN THE MUNICIPAL COURT . . .

"AFFIDAVIT FOR SEARCH WARRANT

"STATE OF CALIFORNIA )
COUNTY OF SANTA CRUZ) ss

"I, Michael Allan Barnes, being sworn, says: There is probable and reasonable cause to believe, and I do believe, that there is now on the premises, structures and rooms situated at . . . [the ranch address] . . . and the vehicle(s) described as . . . [two descriptions of automobiles] . . . and on the person(s) of Chester BOWYER [and] Mary Christine MARI certain property, things, and evidence, consisting of (See attached copy of transcript.) [Sic]

"Your affiant says that there is probable and reasonable cause to believe and that he does believe that the said property constitutes: [ ] stolen or embezzled property [X] property or things used as the means of committing a felony [X] property or things in the possession of a person with the intent to use it as a means of committing a public offense, or in the possession of another to whom he may have delivered it for the purpose of concealing it or preventing its being discovered [X] property or things which consist of an item or constitutes evidence which tends to show that a particular person has committed a felony

"Your affiant says that the facts in support of the issuance of the search warrant are as follows:

". . . [The transcript of the conference call is next attached, commencing with the legend "TELEPHONIC SEARCH WARRANT." A notation on the last page of the transcript reads: "I certify that the foregoing transcript is correct. [s/] . . . [Name of magistrate] . . . Judge May 2, 1973"] . . .

|  | s/  Michael Allen Barnes |
|---|---|
| "Subscribed and sworn to before me on by use of the telephone April 22, 1973 | (Signature of Affiant) |
| and in person April 23, 1973 | s/  [Name] |
|  | (Signature of Magistrate)" |

We note here (1) that the search warrant signed on April 23 was an *original*, and that no "duplicate original" thereof existed at any pertinent time; (2) that the magistrate's signature on the "warrant" was his own, and was not "affixed" by any of the officers as directed by him at the conclusion of the conference call on April 22; and (3) that the time of the warrant's *execution* (i.e., the time at which it was acted upon) was never entered on it.

(1) ■ *The Delay in the Execution of the Federal Arrest Warrants:* Petitioners first contend that Barnes and his fellow officers could have entered the ranch and executed the federal warrants for the Bowyers' arrest outdoors, when the couple was first observed at the ranch on April 21. From this premise, petitioners argue that the delay in arresting the Bowyers until the early morning raid on April 22, and the execution of the warrants on that occasion, amounted to "pretexts" for the conduct of a general, exploratory search of the premises which was otherwise impermissible.

It is true that a search is constitutionally invalid, and that its fruits will be suppressed where an arrest has been employed as a "pretext" to make it. (*United States* v. *Lefkowitz* (1932) 285 U.S. 452, 467 [76 L.Ed. 877, 883, 52 S.Ct. 420, 82 A.L.R. 775]; *People* v. *Haven* (1963) 59 Cal.2d 713, 719-720 [31 Cal.Rptr. 47, 381 P.2d 927]; *People* v. *Nagel* (1970) 4 Cal.App.3d 458, 461-462 [84 Cal.Rptr. 353].) As Barnes testified, however, he planned the large-scale, early morning raid because of the possibilities that many fugitives were present and that the terrain could permit some to escape if the ranch were not adequately surrounded. His decision appears to have been a reasonable exercise of police judgment, and not a "pretext" for a search of the premises. (Cf. *Eiseman* v. *Superior Court* (1971) 21 Cal. App.3d 342, 348-349 [98 Cal.Rptr. 342].) Respondent court's implied finding to this effect is thus supported by substantial evidence for purposes of "appellate review" in the present proceeding. (See § 1538.5, subd. (i); *People* v. *Superior Court (Casebeer)* (1969) 71 Cal.2d 265, 274 [78 Cal. Rptr. 210, 455 P.2d 146].)

(2) ■ *The Entries of the Two Houses:* Although they apparently concede that the officers complied with the announcement requirements of Penal Code section 844 before entering the two ranch dwellings on April 22, petitioners challenge both entries upon the ground that the officers lacked "reasonable grounds for believing" that the Bowyers—the persons named in the federal arrest warrants (see fn. 4, *ante*)—were in either house.[8]

The two houses were obviously residences, and were located close to-

---

[8]With emphasis upon the matters conceded and disputed (as indicated), we quote the cited statute as follows: "844. To make an arrest, . . . a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which . . . [the officer has] . . . *reasonable grounds for believing him to be,* after having *demanded admittance and explained the purpose for which admittance is desired."*

Although petitioners apparently concede the point, we here hold that the officers complied with the announcement provisions of section 844 in all respects. (*Greven* v. *Superior Court* (1969) 71 Cal.2d 287, 291-295 [78 Cal.Rptr. 504, 455 P.2d 432]. Cf. *People* v. *Lawrence* (1972) 25 Cal.App.3d 213, 222 [101 Cal.Rptr. 671].)

gether. Prior to the entries of both, Agent Barnes had seen the Bowyers walking in and out of each house. These observations gave him "reasonable grounds for believing" that they were to be found in one house or the other on April 22, and he was not required to choose between the two buildings; the officers acted reasonably in approaching and entering both houses on April 22. Again, respondent court's implied finding to this effect is supported by substantial evidence for purposes of our review. (See § 1538.5, subd. (i); *People* v. *Superior Court (Casebeer) supra,* 71 Cal.2d 265 at p. 274.)

(3) ■ *The Arrests of Petitioners Thomason and Robinson:* Under the above-described circumstances which attended the officers' encounters with Thomason and Robinson, and from which the inference may readily be drawn that both were fleeing and attempting to escape arrest, the apprehension of each of them was justified. (*Sibron* v. *New York* (1968) 392 U.S. 40, 66-67 [20 L.Ed.2d 917, 936-937, 88 S.Ct. 1889]; *People* v. *Martin* (1956) 46 Cal.2d 106, 108 [293 P.2d 52]; *People* v. *Manis* (1969) 268 Cal.App.2d 653, 658-660 [74 Cal.Rptr. 423].) The contraband items having been found in the northern house during the same course of events, and in view of the close proximity of the two buildings, the subsequent formal arrest of Thomason and Robinson, for possession of those items, was also justified. (§ 836. See, again, § 1538.5, subd. (i); *People* v. *Superior Court (Casebeer) supra,* 71 Cal.2d 265 at p. 274.)

### The "Telephonic Search Warrant"

■ The officers having lawfully entered the northern house as discussed above, the contraband items observed in plain view there were subject to valid seizure and are admissible in evidence. (*Harris* v. *United States* (1968) 390 U.S. 234, 236 [19 L.Ed.2d 1067, 1069, 88 S.Ct. 992].) Under all the circumstances as also discussed, the discovery and seizure of those items justified the arrest of all four petitioners on charges of possessing them (§ 836), and the limited search of both houses for other suspects. (*People* v. *Block* (1971) 6 Cal.3d 239, 245-246 [103 Cal.Rptr. 281, 499 P.2d 961].)

On the other hand, the officers could not validly have searched either dwelling beyond the area which was "within . . . [the] . . . immediate control" of any petitioner: i.e., "the area from within which he [or she] might gain possession of a weapon or destructible evidence." (*Chimel* v. *California* (1969) 395 U.S. 752, 762-763, 768 [23 L.Ed.2d 685, 693-694, 696-697, 89 S.Ct. 2034].) Accordingly, it appears that Agent Barnes

correctly concluded that the officers needed a search warrant to conduct a further and more thorough search of the premises; that he had probable cause to obtain one by reason of the discovery of contraband in plain view in one of the houses (*People* v. *Stout* (1967) 66 Cal.2d 184, 192-193 [57 Cal.Rptr. 152, 424 P.2d 704]; *People* v. *Nadell* (1972) 23 Cal.App.3d 746, 752 [100 Cal.Rptr. 444]); and that he adequately communicated the factual elements of probable cause to the magistrate in the conference telephone call.

Consistent with pertinent constitutional provisions (U.S. Const., Amend. IV; Cal. Const., art. I, § 19), section 1525 provides that "[a] search warrant cannot be issued but upon probable cause, supported by affidavit . . . ." Section 1526, which formerly required that a supporting affidavit be executed in writing (see Stats. 1957, ch. 1882, § 1, p. 3288), was amended in 1970 to permit the magistrate to accept an "oral statement under oath" which will suffice as such "affidavit" provided it is recorded, transcribed, certified and filed in the magistrate's court.[9] If the last-mentioned conditions are met, an "oral statement under oath" which is communicated to the magistrate *by telephone* will serve as an "affidavit" within the meaning of subdivision (b) of the statute. (*People* v. *Aguirre* (1972) 26 Cal.App.3d Supp. 7, 10-11 [103 Cal.Rptr. 153].)

Barnes' telephonic declarations to the magistrate were made on April 22, and the recording thereof was subsequently treated in substantial compliance with the conditions prescribed by section 1526, subdivision (b). (We regard the magistrate's delay in certifying the transcript as a short-lived ministerial omission which did not amount to a material deviation from the statutory procedure. The fact that Barnes did not sign the written "affidavit" until April 23 is equally immaterial; when the procedure permitting an oral "affidavit" is followed, neither a formal affidavit nor the affiant's signature is required.) Consequently, Barnes' sworn telephonic

---

[9] As amended in 1970 (Stats. 1970, ch. 809, § 1, p. 1531), section 1526 read in full as follows (amending language italicized): "1526. (*a*) The magistrate may, before issuing the [search] warrant, examine on oath the person seeking the warrant and any witnesses he may produce, and must take his affidavit or their affidavits in writing, and cause same to be subscribed by the party or parties making same.

"(*b*) *In lieu of the written affidavit required in subdivision (a), the magistrate may take an oral statement under oath which shall be recorded and transcribed. The transcribed statement shall be deemed to be an affidavit for the purposes of this chapter. In such cases, the recording of the sworn oral statement and the transcribed statement shall be certified by the magistrate receiving it and shall be filed with the clerk of the court.*"

(The fourth sentence which now appears in subdivision (b), and which is not involved in the present case, was added in 1972. (See Stats. 1972, ch. 662, §1, p. 1223.))

declarations constituted an "affidavit" which was sufficient to support the issuance of a search warrant.

An "oral" procedure, however, is permitted by statute only as to the *affidavit* in support of a search warrant: the Legislature has made no equivalent provision permitting "oral" issuance of the warrant itself. Section 1523 defines a search warrant as "an order *in writing, . . . signed* by a magistrate, directed to a peace officer, commanding him to search . . . ." (Italics added.) Section 1528 provides that, if the magistrate is satisfied from the "affidavit" (whether written or oral, as provided in section 1526 [see fn. 9, *ante*]) that there is probable cause for a search warrant, he must "issue" a "signed" warrant addressed to a peace officer and "commanding him *forthwith* to search . . . ."[10] (Italics added.) Both sections clearly require that a search warrant be issued *in writing.* The same requirement is imported by other sections which specify a form for the warrant which is to be *signed* (§ 1529) and which provide for its "return" to the magistrate (§ 1537) and its subsequent handling by him (§ 1541); all are apparently directed to a physical, written instrument.

The language of sections 1523 and 1528, relative to the warrant "commanding" the addressed peace officer to act, is couched in prospective terms: both sections thus indicate that the officer is authorized to act pursuant to the warrant only *after* it exists in writing (§§ 1523, 1528) and (1) has been "signed" by the magistrate (§ 1523; § 1528, subd. (a)) or (2) his name has been "signed" to a "duplicate original" thereof pursuant to his oral authorization. (§ 1528, subd. (b).) The prospective language imports that a written instrument, in one form or the other, must be in existence before a search may be conducted.[11]

---

[10]Section 1528 was amended by the same enactment which amended section 1526, in 1970, as described in footnote 9, *ante.* (Stats. 1970, ch. 809, § 2, pp. 1531-1532.) As thereby amended, section 1528 reads (with the amending language shown by italicizing):

"*(a)* If the magistrate is thereupon satisfied of the existence of the grounds of the application, or that there is probable cause to believe their existence, he must issue a search warrant, signed by him with his name of office, to a peace officer in his county, commanding him forthwith to search the person or place named, for the property or things specified, and to retain such property or things in his custody subject to order of the court as provided by Section 1536.

"*(b) The magistrate may orally authorize a peace officer to sign the magistrate's name on a duplicate original warrant. A duplicate original warrant shall be deemed to be a search warrant for the purposes of this chapter, and it shall be returned to the magistrate as provided for in Section 1537. In such cases, the magistrate shall enter on the face of the original warrant the exact time of the issuance of the warrant and shall sign and file the original warrant and the duplicate original warrant with the clerk of the court as provided for in Section 1541.*"

[11]When the present magistrate orally authorized Barnes to "affix my name . . . to the search warrant" and told him that ". . . [it] . . . will be filed with the court

In the present case nothing existed in writing, neither the magistrate nor any of the officers signed any document, and the magistrate did nothing further, during or after the "issuance" of the so-called "telephonic search warrant" on April 22 and *before* the challenged search was conducted upon purported authority thereof. As previously mentioned, the pertinent statutes do not authorize an *oral* search warrant ("telephonic" or otherwise) as such, nor do they authorize a search which is not preceded by an original "order in writing, . . . signed by a magistrate" (§ 1523) or by a written "duplicate original" of such order to which his name has been signed by a peace officer pursuant to the magistrate's oral authorization. (§ 1528, subd. (b).) In the absence of any writing in this case as required by statute, the "telephonic" search warrant was wholly invalid.

The Attorney General argues that the preservation of the tape recording of the oral authorization to search, and compliance with the other safeguards required as to the "oral affidavit" by section 1526, subdivision (b), memorialized the oral authorization so as to serve all the purposes which are effected by a written search warrant. This argument fails because the procedure followed was not expressly authorized by law and violated the apparent statutory requirements that a search warrant must be in one or another of the authorized *written* forms before a valid search can be conducted. ■ Because the proceeding by a search warrant is a "drastic one," whose abuse led to the adoption of the Fourth Amendment itself, legislation regulating the process must be liberally construed in favor of the individual affected. (*Sgro* v. *United States* (1932) 287 U.S. 206, 210 [77 L.Ed. 260, 262, 53 S.Ct. 138, 85 A.L.R. 108]; *People* v. *Mills* (1967) 251 Cal.App.2d 420, 422 [59 Cal.Rptr. 489].) ". . . [E]very constitutional and statutory requirement must be fully met, including all formalities required by statute, before a valid search warrant may issue." (79 C.J.S., Searches and Seizures, § 71. Cf. 68 Am.Jur.2d, Searches and Seizures, § 73.)

---

. . ." (see the closing lines of the conference telephone call, quoted *supra*), he apparently had in mind that Barnes would sign and execute a "duplicate original [search] warrant" as permitted by section 1528, subdivision (b). (See fn. 10, *ante*.) From this fact, petitioners contend (1) that the statute requires the magistrate to execute an original warrant at the time he authorizes a peace officer to sign his name to a "duplicate original"; (2) that it further requires him, *at the same time,* to "enter on the face of the original warrant the exact time of the issuance of the warrant" (see *ibid*.); and (3) that the procedure was invalidated in the present case because the magistrate never performed either act. But these arguments would be relevant only if the "duplicate original" procedure had been employed in fact. This did not occur: the record is also clear that Barnes did not sign the magistrate's name to anything at any time, and that no written warrant existed in any form when the officers made the challenged search. Accordingly, the question whether the magistrate substantially complied with section 1528, subdivision (b), is not relevant because the statute was not invoked in fact, and we need not decide the questions raised by petitioners in this regard.

■

■ A second, and equally compelling, reason for our holding is to be found in the legislative history of the 1970 enactment which produced the presently pertinent language of sections 1526 and 1528 (Stats. 1970, ch. 809, §§ 1-2, pp. 1531-1532: see fns. 9 and 10, *ante*.) That enactment resulted from the passage of Senate Bill 306 at the 1970 session of the Legislature. In its form as introduced, a principal provision of the bill would have amended section 1523 to strike the requirement that a search warrant be "in writing" and to make the section read: "1523. A search warrant is an order issued by a magistrate, commanding a peace officer to search. *The order may be verbal or written.*" (Italics added.)

In the subsequent progress of Senate Bill 306, the 1970 Legislature deleted the proposed amendment of section 1523, and substantially changed the measure in other respects, so that the finally enacted bill resulted in the present language of sections 1526 and 1528 as previously quoted herein. (See fns. 9 and 10, *ante.* See also Senate Bill 306 (1970) as introduced; Final Calendar of Legislative Business (1970) p. 89; 1 Sen J. (March 19, 1970) pp. 795-796; Stats. 1970, ch. 809, §§ 1-2, pp. 1531-1532.)

A contemporaneous comment summarized these actions as follows: ". . . [Senate Bill 306] . . . was proposed by the District Attorneys Association. *It was originally designed to provide for oral authorization to search. Since this was not acceptable to the legislature,* the legislation was amended to provide . . . *limited* liberalization of procedures for obtaining a search warrant." (Italics added.) (*Review of Selected 1970 California Legislation* (1971) 2 Pacific L.J. 275, 377-378.) "Oral authorization to search" having been expressly rejected by the Legislature, we decline to sanction it here.

Let a peremptory writ of mandate issue, directing respondent court, in the course of appropriate proceedings, to identify and itemize the evidence which was seized in the search conducted on April 22, 1973, as purportedly authorized by the so-called "telephonic search warrant," and to enter an order suppressing such evidence. As to any other evidence seized on said date, the alternative writ heretofore issued is discharged and the petition is denied.

Devine, Acting P. J.,* and Christian, J., concurred.

A petition for a rehearing was denied on February 8, 1974, and the following opinion was then rendered:

THE COURT.—In conjunction with a petition for rehearing filed by the

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

People, we are informed for the first time that, three weeks after the "Petition for Writ of Prohibition and/or Mandate" was filed in this court and an alternative writ was issued, petitioner Robinson entered a plea of guilty to one of the charges and the charges against the other three petitioners were dismissed. For these reasons, and without our knowledge during consideration of the cause, it has been moot almost from its inception. The Attorney General has not been remiss in informing the court of developments; he was inexplicably uninformed thereof by the district attorney involved.

■ While a court will not ordinarily consider a cause which is moot, an exception to this rule may apply in certain cases: "Where an action concerns an issue of great public interest that is likely to recur, an appellate court may exercise an inherent discretion to resolve the issue even though an event occurring during its pendency might normally render the matter moot. [Citations.]" (*California Medical Assn.* v. *Brian* (1973) 30 Cal.App.3d 637, 650 [106 Cal.Rptr. 555].)

There are indications in the present record that the so-called "telephonic search warrant" procedure has been regularly followed in the County of Santa Cruz, and the 1970 amendment of Penal Code section 1526, subdivision (b) has been interpreted by at least one important authority as having "the effect of creating the so-called 'oral search warrant . . .'" (The Attorney General, Search & Seizure (July 1972) § 2.15, p. 34.) Our decision invalidates a "telephonic" or "oral" search warrant under the circumstances shown, and it will advise the Legislature of our interpretation of its actions, in 1970, wherein it amended section 1526, subdivision (b).

For these reasons, we deem our decision to be within the exception stated above. We therefore permit it to stand, and to be certified for publication (with this addendum) as originally contemplated.

The petition of the real party in interest for a hearing by the Supreme Court was denied March 8, 1974.