[Crim. No. 43103. Second Dist., Div. Seven. July 15, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL MORRONGIELLO, Defendant and Appellant.

4

**COUNSEL**

Newton & Newton and Jerry L. Newton for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—Defendant, Michael Morrongiello, pled guilty to the charge of possession of cocaine for sale. He was duly convicted and sentenced. The sole issue on appeal is whether the trial court erred in denying defendant's motion under Penal Code section 1538.5 to suppress all evidence, including cocaine, taken from his possession under a "telephonic" search warrant.

FACTS

On October 5, 1981, Detective Welch of the Los Angeles Police Department was conducting a narcotics investigation into the activities of three individuals: Boyarsky, Mosias and Michael Morrongiello, also known as Steve Silver. That day, while acting in an undercover capacity, Welch met with Boyarsky for the purpose of purchasing a one-half kilogram of cocaine. Boyarsky took Welch to meet with Mosias, who sold Welch the contraband. At that time, Boyarsky and Mosias were arrested.

Soon after his arrest, Mosias was interviewed by Detective Lewis of the Los Angeles Police Department. Mosias told Lewis that approximately five kilos of cocaine had recently been brought to Southern California and that this cocaine was presently in the possession of Steve Silver.

Mosias told Detective Lewis that Steve Silver had supplied him the half kilo of cocaine he had sold to Detective Welch. The cocaine had been brought to California packaged in one-quart tin cans. He stated that Silver was staying at the Sheraton Hotel located near the Los Angeles airport.

Detective Lewis, after being advised of these facts, telephoned the Sheraton Hotel and was advised that a Steve Silver had registered at the hotel on October 5, 1981, at 12 noon, and was staying in room 1419. Lewis had

Silver paged, and when there was no answer left word for Silver to call an undercover telephone number at the police station.

At approximately 8 p.m., on October 5, 1981, Steve Silver called this undercover number and spoke with the codefendant Mosias. Detectives Lewis and Mark Stocks of the Glendale Police Department listened in on this call. Mosias told Silver that he had sold a half kilo of cocaine and that the buyers were interested in purchasing an additional half kilo. Silver told Mosias that he could not conduct the transaction that evening, that the cocaine he did have was moving fast, that he had received a new shipment and had to go someplace, and that Mosias could come by the hotel the following morning.

After this telephone call, Detective Lewis advised both Detectives Welch and Stocks of this information. Lewis instructed Welch to go to the hotel while Stocks obtained a search warrant. Welch went to the hotel with three other officers of the Los Angeles Police Department for the purpose of conducting surveillance on Silver's room, 1419.

When they arrived at the hotel the officers proceeded to the 14th floor. There they saw Morrongiello walking down the hallway towards an elevator. He had a duffel bag in his possession. Welch and the others followed the defendant and boarded the elevator with him. These four were the only passengers in the elevator.

During the descent one of the officers introduced himself to the defendant as a police officer conducting a narcotics investigation. He asked the defendant to produce some identification. Welch held the duffel bag while the defendant reached into his pocket for some identification.

The defendant produced identification in the name of Steve Silver. Detective Welch, at the time he took the duffel bag determined it was heavy and, when he set it down on the elevator floor, he heard a distinct metallic clunk. At that time he formulated the opinion that the bag contained the tin cans which in turn contained cocaine as he had earlier been advised by Mosias.

At the basement, defendant was taken off the elevator by the detectives and moved to the hotel security office where he was handcuffed to a chair. The bag, then in the possession of Detective Welch, was placed on a table in the security office. The defendant, according to Detective Welch, was not free to leave that office. During the rest of the evening defendant remained handcuffed to the chair, one or more officers were with him, and he was not in a position, according to Detective Lewis, where he could get his hands on the bag.

While the events described above were taking place, Detective Stocks decided to seek a telephonic search warrant. At approximately 11:10 p.m. on October 5, Detective Stocks telephoned a magistrate and applied to him for a search warrant for the person of Steve Silver and room 1419 of the Sheraton Hotel.

Stocks' oral affidavit for the warrant was based in part on the statements by Mosias that he had received half a kilo of cocaine from Silver that morning and that Silver was currently in possession of about five kilos of cocaine. No mention was made at that time of the fact that the cocaine was believed to be packaged in large tin cans.

Based on Stocks' oral affidavit, the magistrate authorized his name to be signed to a warrant for the search of Silver and his hotel room.

Soon after he received authorization for the first search warrant, Stocks received a telephone call from the officers at the Sheraton. Stocks was told about the duffel bag and about the metallic sound from within it. Stocks thereafter telephoned the same magistrate at 11:40 p.m. in the evening of October 5 for the purpose of obtaining permission to search the duffel bag. Stocks testified that after the magistrate authorized the search of the duffel bag Stocks wrote on the first search warrant the additional notation that the bag was included in the search and placed a second signature and initials of the magistrate on page two of that warrant.

Stocks then went to the Sheraton Hotel, arriving at approximately 1 a.m. on October 6, 1981. Stocks stated that he saw the defendant sitting in a chair at the security office and read him the search warrant "word for word." Thereafter, the duffel bag was opened, tin cans removed therefrom, and subsequently cocaine was found inside those cans.

Following the search of the duffel bag, Detective Stocks placed the defendant under arrest. The defendant and the officers then left the basement and went to room 1419 where a search of the room took place. Following that search, Stocks left a copy of a search warrant with the defendant. The copy left with the defendant was received into evidence at the hearing on the motion to suppress. That warrant does not include any authorization for the search of the duffel bag.

Later that day Detective Stocks took the duplicate original search warrant to the Glendale courthouse where he filed it with the clerk of the court. The next day, October 7, 1981, Stock received a telephone call from a deputy district attorney. The deputy asked Stocks whether or not he had placed the words "Duplicate To Original Search Warrant" on the duplicate original

warrant filed October 6, 1981. Stocks said he had not, and furthermore he had not written times on the warrant. After advising the magistrate that he would be adding these words to the warrant, Stocks went to the courthouse where, he testified, he wrote this additional information on the warrant.

## ISSUES

Defendant concedes that there was probable cause for a search of his person and his hotel room. He also concedes good cause existed for a night-time search of the hotel room.

The issues are:

1. Was there probable cause to search the duffel bag and its contents?

2. Was the "telephonic" search warrant for the duffel bag and its contents obtained in conformity with applicable statutes?

3. Was good cause established for a nighttime search of the duffel bag and its contents?

## PROBABLE CAUSE EXISTED FOR THE SEARCH OF THE DUFFEL BAG AND THE TIN CANS

The record shows that, in his second affidavit to the issuing magistrate, Officer Stocks requested that the duffel bag also be searched *"due to the fact that this confidential informant related earlier in the earlier search warrant, our informant stated that to his/her knowledge, many times/ there are, the way that the cocaine is transported, is in 32 ounce cans.* The Los Angeles Police Department officers' [sic] advised me that while setting this beige-canvas bag down on the floor that it made a noise—a metalic [sic] -type noise like it contained some type of possible cans." (Italics added.)

Seizing on the italicized sentence fragment, defendant argues that there was no mention in the earlier affidavit of any statement by the confidential informant regarding cans containing cocaine. We do not know if the police academy teaches officers to speak in such stilted language or whether they are infected with a flair for the circumlocutory once they take to the field. In any case, we believe a plain English translation of Officer Stocks' statement would be: "The confidential informer to whom I referred in my previous affidavit told me that he/she knows that cocaine is often packaged in 32-ounce cans." In his second affidavit Officer Stocks was not referring to information from the informant related earlier, but was referring to the informant. In essence, Officer Stocks told the magistrate that the informant

to whom the officer had referred earlier had provided additional information which allowed the reasonable inference that contraband was contained within 32-ounce cans inside the duffel bag.

■ We believe that the information from Mosias linking defendant to the possession of cocaine for sale together with his statements that the cocaine is often transported in large metal cans and the metallic sound from within the bag provided probable cause for the search.

### THERE WAS SUBSTANTIAL EVIDENCE TO SUPPORT A FINDING THAT THE SEARCH WARRANT HAD BEEN AMENDED TO INCLUDE THE DUFFEL BAG BEFORE THE DUFFEL BAG WAS SEARCHED

The telephonic search warrant procedure used here is authorized by Penal Code[1] sections 1526, subdivision (b) and 1528, subdivision (b). ■ The procedure differs from the normal procedure in two respects. In lieu of a written affidavit to support issuance of the warrant, the magistrate "may take an oral statement under oath which shall be recorded and transcribed." (§ 1526, subd. (b).) The requirement that the warrant must be in writing signed by a magistrate (§ 1523) may be satisfied by the magistrate orally authorizing a peace officer to sign the magistrate's name on a duplicate original warrant. (§ 1528, subd. (b).) In all other respects the procedural requirements for the issuance and execution of a search warrant apply to telephonic warrants. (*Bowyer* v. *Superior Court* (1974) 37 Cal.App.3d 151, 162-164 [111 Cal.Rptr. 628, 112 Cal.Rptr. 266].)

There is no doubt that the magistrate orally authorized the search of defendant's duffel bag. But defendant contends that when the duffel bag was searched the warrant had not yet been amended to include that authorization; that the reference to the duffel bag was added to the warrant sometime after the search. Therefore, defendant contends, a warrant for the search of the duffel bag and seizure of its contents did not exist at the time the bag was searched and the cans containing cocaine could not be used as evidence at his trial. (See *Bowyer* v. *Superior Court, supra,* 37 Cal.App.3d 151, 162-164.)

The record contains substantial evidence to support a finding that at the time of the search the "duplicate original" warrant did include directions to search the duffel bag.

We first dispose of defendant's suggestion that because the trial judge did not make any findings of fact on the record we should exercise independent

---

[1] All statutory references are to the Penal Code.

judgment in determining whether the statutory requirements for a telephonic search warrant were followed. ■ The standard of review of the denial of a motion to suppress is well established. "A proceeding under section 1538.5 to suppress evidence is a full hearing on the issues before the superior court sitting as finder of fact. [Citations.] The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence. [Citations.]" (*People* v. *Superior Court* (*Keithley*) (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

There is no requirement that the trial judge's findings be expressed on the record. (*People* v. *Manning* (1973) 33 Cal.App.3d 586, 599 [109 Cal.Rptr. 531].)

■ We turn now to the question of whether there was substantial evidence to support a finding that the warrant Officer Stocks executed contained the magistrate's direction to search the duffel bag. The record contains the following evidence on this issue:

Stocks made an oral statement under oath to the magistrate in which he described the bag and explained why he wanted to search it.

The magistrate authorized Stocks to amend the first search warrant to add the bag and any closed containers found in it.

Stocks testified that he added the directions to search the bag and containers to the first search warrant prior to going out to the hotel to perform the search.

Before going to the hotel to conduct the search, Stocks placed the magistrate's initials and name and his initials on the warrant twice: after obtaining authorization to search the defendant and his hotel room and again after obtaining authorization to search the duffel bag.

The only writing added to the duplicate original search warrant after the search had been conducted were the words "Duplicate To Original Search Warrant" and the times and dates beside the magistrate's initials and name.[2]

---

[2]Because these notations are not required to appear on the search warrant prior to its execution, their addition after the search does not affect the warrant's validity. (§ 1534, subd. (b) and see *Bowyer* v. *Superior Court, supra,* 37 Cal.App.3d 151, 162-164.)

Stocks testified that he read the entire warrant to the defendant including the directions to search the duffel bag.

The defendant challenged Officer Stocks' testimony and credibility by:

Introducing a copy of the search warrant left with him by the officers after the search. This search warrant does not include a reference to the duffel bag.

Testifying that Stocks stated to him, "This warrant did not include your bag but . . . you will get a copy of that later."

Pointing out an inconsistency between Stocks' testimony that the words "Duplicate to Original Search Warrant" were written on the document after it was filed and the fact that the words are covered by a blue back indicating they were written on the document before it was filed.

By way of explanation on these points, Officer Stocks testified that in the process of copying and collating the duplicate original search warrant, page one of the first search warrant (which did not mention the duffel bag) appeared to have been stapled to page two of the warrant as amended with the second set of names and initials and that when he wrote the words "Duplicate to Original Search Warrant" on the duplicate original at the courthouse the blue backing "was up further." On examination after defendant's testimony, Stocks repeated that he had read the entire search warrant to defendant including the reference to the duffel bag. On cross-examination, Stocks denied that the reference to the duffel bag was added to the duplicate original warrant after the search.

It is apparent that the trial court believed Officer Stocks' testimony and his explanation of why defendant's copy of the search warrant did not refer to the duffel bag and how the words "Duplicate To Original Search Warrant" happened to be covered by the blue back. We perceive no basis for rejecting the trial judge's implied findings.

Because the evidence supports a finding that the duffel bag was included in the search warrant at the time of the search, we need not consider the consequences where a magistrate verbally authorizes the search of a particular thing but reference to that thing is inadvertently omitted from the duplicate original search warrant.[3]

---

[3](Cf. *Bowyer* v. *Superior Court, supra,* 37 Cal.App.3d 151, 162-164 with *People* v. *Moore* (1973) 31 Cal.App.3d 919, 927 [107 Cal.Rptr. 590].)

We note in passing that in the dense underbrush of search and seizure law one can lose the way. It is important, from time to time, to poke our heads above the brush and refocus on the public purposes of the warrant procedure. There are two. ■ The first is to require that decisions about the sufficiency and reliability of evidence to justify a search are made by a neutral and detached magistrate. (*People* v. *Superior Court (Robinson)* (1977) 75 Cal.App.3d 76, 80 [141 Cal.Rptr. 917].) This is precisely what happened in the case at bar. It is undisputed that Officer Stocks presented his evidence to justify a search of the duffel bag to a magistrate and that the magistrate authorized the search. That probable cause for the search existed cannot be seriously disputed. (See *ante,* pp. 8-9.) The second purpose is to notify the person whose property is to be searched that the search has in fact been authorized by a magistrate. (*Rogers* v. *Superior Court* (1973) 35 Cal.App.3d 716, 720 [111 Cal.Rptr. 9].) This reduces the risk of force in carrying out the search as well as the danger that the police might use blank warrants in conducting searches in the hope that a friendly magistrate will sign them *post hoc.* (See *Sternberg* v. *Superior Court* (1974) 41 Cal.App.3d 281, 290-291 [115 Cal.Rptr. 893].) In the present case, even accepting defendant's version of the search, there is no evidence that he objected to a search of his bag[4] and the transcription of the telephone conversation between Stocks and the magistrate[5] and the magistrate's entry of the time on the original warrant (§ 1528, subd. (b)) show that the search of the bag was authorized before it took place.

Our strong preference is to encourage peace officers to seek search warrants. (*People* v. *Dickson* (1983) 144 Cal.App.3d 1046 [192 Cal.Rptr. 897].) As Justice Goldberg observed in *United States* v. *Ventresca* (1965) 380 U.S. 102, 108 [13 L.Ed.2d 684, 688, 85 S.Ct.741], "A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting."

We believe this admonition is particularly appropriate to the development of the law with respect to "telephonic" search warrants. ■ The use of such warrants should be encouraged where the alternative would be a warrantless search. The "telephonic" procedure makes possible the protection of essential Fourth Amendment rights while meeting the needs of the police to prevent the destruction or removal of evidence. Furthermore, the avail-

---

[4]If defendant had objected, Stocks could have added the authorization to search the bag at that time since he had the magistrate's authorization to do so. (Cf. *Sternberg* v. *Superior Court, supra,* 41 Cal.App.3d at p. 290.)

[5]The Penal Code only requires the officer's oral affidavit to be recorded, not the magistrate's oral authorization for the officer to sign the magistrate's name. (Cf. § 1526, subd. (b) with § 1528, subd. (b).) We approve of the practice followed in the case at bar where both the officer's oral affidavit and the magistrate's oral authorization were recorded.

ability of the "telephonic" search warrant significantly reduces the circumstances in which a warrantless search can be justified by the exceptions for exigent circumstances, "plain view" or inevitable discovery—doctrines which undermine Fourth Amendment protections to a greater or lesser degree. (See Note, *Oral Search Warrants: A New Standard Of Warrant Availability* (1973) 21 UCLA L.Rev. 691, 706-712.)

This is not to say that the courts should just wink at procedural irregularities in search warrants. But where, as here, the officer has probable cause for a search, conveys his evidence to a magistrate, goes back to the magistrate with additional evidence for an expanded search and the magistrate makes an independent determination in both instances that a search is justified, we would be reluctant to hold that all this effort was wasted due to a clerical error on the officer's part.

### GOOD CAUSE EXISTED FOR THE NIGHTTIME SEARCH OF THE DUFFELBAG

Defendant concedes that the officers had good cause for a nighttime search of his hotel room. Good cause consisted of defendant's statements to Mosias, overheard and recorded by the officers, that the cocaine was moving fast and that defendant intended to vacate his room early the next morning. (Cf. *People* v. *Mardian* (1975) 47 Cal.App.3d 16, 35 [121 Cal.Rptr. 269]; *People* v. *Watson* (1977) 75 Cal.App.3d 592, 598 [142 Cal.Rptr. 245].) Thus, the police could reasonably believe that neither the cocaine nor the defendant would be found in the hotel room the next morning.

Defendant contends, however, that once he and his duffel bag were in the custody of the police and he was handcuffed to a chair out of reach of the bag, good cause for a nighttime search of the bag did not exist. (Cf. *People* v. *Mardian, supra,* 47 Cal.App.3d 16, 35.)

We do not believe that the risk of removal or destruction of the evidence is the only ground that will justify a nighttime search; particularly where the search does not involve an intrusion into a dwelling.

The Fourth Amendment protects our " 'persons, houses, papers, and effects, against unreasonable searches and seizures . . . .' " "The basic purpose of this Amendment, as recognized in countless decisions . . . is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." (*Camara* v. *Municipal Court* (1967) 387 U.S. 523, 528 [18 L.Ed.2d 930, 935, 87 S.Ct. 1727].) Thus, determining the reasonableness of a search requires a balancing of the government's interest in conducting the search against the individual's interest in the privacy and

security of his person, home, papers and effects. (*Johnson* v. *United States* (1948) 333 U.S. 10, 14 [92 L.Ed. 436, 440, 68 S.Ct. 367].) ■ Even without the "good cause" requirement for a nighttime search contained in section 1533,[6] the element of a nighttime intrusion has to be considered in determining the reasonableness of the search. (*United States* v. *Gibbons* (10th Cir. 1979) 607 F.2d 1320, 1326; and see *Jones* v. *United States* (1958) 357 U.S. 493, 498 [2 L.Ed.2d 1514, 1518, 78 S.Ct. 1253]; *Monroe* v. *Pape* (1960) 365 U.S. 167, 210 [5 L.Ed.2d 492, 517, 81 S.Ct. 473].) (Frankfurter, J., concurring and dissenting.)

Unquestionably the proposed nighttime intrusion into an occupied family home must receive the strictest scrutiny, *People* v. *Watson, supra,* 75 Cal.App.3d 592, 595; *United States* ex rel. *Boyance* v. *Myers* (3d Cir. 1968) 398 F.2d 896, 898 and cases cited. The search in the case at bar falls at the other end of the spectrum. ■ The officers did not enter defendant's hotel room to search the bag. They encountered defendant in the hallway outside his room and escorted him to the hotel security office. This intrusion into defendant's privacy was no greater because it occurred at approximately 10 p.m. than if it had occurred at 10 a.m.

Once they had identified defendant as the "Steve Silver" referred to by their informant and discovered that his duffel bag probably contained cocaine the officers had essentially two choices: they could arrest defendant, book and incarcerate him and obtain a search warrant for the bag the next day; or they could detain defendant for a short period until Officer Stocks arrived with a warrant to search the bag then and there. They chose the least intrusive alternative. We do not find the officer's choice to have been unreasonable. Assuming defendant's bag had not contained cocaine (and the results of the search of his person and his room were also negative), he would have been free to go and the officers would have been free to pursue other activities. On the other hand, if the officers waited until the next day to search the bag, defendant would have spent the night in jail before being exonerated and the officers would have spent considerable time at public expense in following a false lead. Cf. *United States* v. *Gibbons, supra,* 607 F.2d at p. 1327 and *Miller* v. *State* (1980) 269 Ark. 341 [605 S.W.2d 430, 435], in which the need to expedite the investigation made the nighttime search reasonable.

Under the circumstances of this case, we conclude that the nighttime search of defendant's bag was reasonable. (Cf. *People* v. *Rodriguez* (1970) 10 Cal.App.3d 18, 28 [88 Cal.Rptr. 789].)

---

[6]Section 1533 provides: "Upon a showing of good cause, the magistrate may, in his discretion, insert a direction in a search warrant that it may be served at any time of the day or night. In the absence of such a direction, the warrant shall be served only between the hours of 7 o'clock a.m. and 10 o'clock p.m."

The judgment is affirmed.

Schauer, P. J., and Thompson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 7, 1983.